# W. W. CARGILL CO. *v.* MINNESOTA.

## ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 116. Argued and submitted December 3, 4, 1900.—Decided March 5, 1901.

Chapter 148 of the General Laws of Minnesota for the year 1895, entitled "an act to regulate the receipt, storage and shipment of grain at elevators and warehouses on the right of way of railroads, depot grounds and other lands used in connection with such line of railway in the State of Minnesota, at stations and sidings, other than at terminal points," contained in sections 1 and 2 the following provisions: "Section 1. All elevators and warehouses in which grain is received, stored, shipped or handled and which are situated on the right of way of any railroad, depot grounds or any lands acquired or reserved by any railroad company in this State to be used in connection with its line of railway at any station or siding in this State, other than at terminal points, are hereby declared to be public elevators and shall be under the supervision and subject to the inspection of the Railroad and Warehouse Commission of the State of Minnesota, and shall, for the purposes of this act, be known and designated as public country elevators or country warehouses. It shall be unlawful to receive, ship, store or handle any grain in any such elevator or warehouse, unless the owner or owners thereof shall have procured a license therefor from the state Railroad and Warehouse Commission, which license shall be issued for the fee of one (1) dollar per year, and only upon written application under oath, specifying the location of such elevator or warehouse and the name of the person, firm or corporation owning and operating such elevator or warehouse and the names of all the members of the firm or the names of all the officers of the corporation owning and operating such elevator or warehouse and all moneys received for such licenses shall be turned over to the state grain inspection fund. Such license shall confer upon the licensee full authority to operate such warehouse or elevator in accordance with the laws of this State and the rules and regulations prescribed by said commission, and every person, company or corporation receiving such license shall be held to have accepted the provisions of this act, and thereby to have agreed to comply with the same. If any elevator or warehouse is operated in violation or in disregard of the laws of this State, its license shall, upon due proof of this fact, after proper hearing and notice to the licensee, be revoked by the said Railroad and Warehouse Commission. Every such license shall expire on the thirty-first (31st) day of August of each year. Sec. 2. No person, firm or corporation shall in any manner operate such public country elevator or country warehouse without having a license as specified in the

preceding section, and any attempt to operate such elevator or warehouse without such license shall be deemed a misdemeanor to be punished as hereinafter provided, and any attempt to operate such elevator or warehouse in violation of law and without having the license herein prescribed, may upon complaint of the party aggrieved, and upon complaint of the Railroad and Warehouse Commission, be enjoined and restrained by the district court for the county in which the elevator or warehouse in question is situate, by temporary and permanent injunction, conformably to the procedure in civil actions in the district court." *Held:*

(1) That the highest court of the State having decided that the provision requiring a license was separable from other provisions, it was the duty of the Federal Court to accept that interpretation of the statute:

(2) That the mere requirement of a licensee to engage in the business specified in the statute was to be referred to the general power of the State to adopt such regulations as were appropriate to protect the people in the enjoyment of their relative rights and privileges, and to guard them against fraud and imposition, and is not forbidden by the Fourteenth Amendment:

(3) That an acceptance of a license, in whatever form, will not require the licensee to respect or to comply with any provisions of the statute, or with any regulations prescribed by the state Railroad and Warehouse Commission, that are repugnant to the Constitution of the United States:

(4) That as the statute applied to all of the class defined by its first section it was not invalid by reason of its non-application to those who own or operate warehouses not situated on the right of way of a railroad. Such a classification was not so unreasonable as to amount to a denial of the equal protection of the laws, nor was the requirement of a license a regulation of commerce among the States.

THE case is stated in the opinion of the court.

*Mr. Ralph Whelan* for plaintiff in error.

*Mr. W. B. Douglas* and *Mr. W. J. Donahower* submitted on their brief for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

The present action was brought in one of the courts of Minnesota, in the name of the State, against the W. W. Cargill Company, a Wisconsin corporation. The relief sought was a decree

perpetually enjoining the defendant from operating a certain elevator and warehouse owned by it, situated on the right of way of the Chicago, Milwaukee and St. Paul Railway Company, in the village of Lanesboro, Minnesota, until it should have obtained a license from the Railroad and Warehouse Commission of that State.

The suit is based on a statute of Minnesota, approved April 16, 1895, and entitled "An act to regulate the receipt, storage and shipment of grain at elevators and warehouses on the right of way of railroads, depot grounds and other lands used in connection with such line of railway in the State of Minnesota, at stations and sidings, other than at terminal points." Gen. Stats. Minn. 1895, c. 148, p. 313.

It seems to be necessary to a clear understanding of the case and to the disposition of some of the questions presented for consideration that the entire act be examined. It is therefore given in full in the margin.[1]

---

[1] "§ 1. All elevators and warehouses in which grain is received, stored, shipped or handled and which are situated on the right of way of any railroad, depot grounds or any lands acquired or reserved by any railroad company in this State to be used in connection with its line of railway at any station or siding in this State, other than at terminal points, are hereby declared to be public elevators, and shall be under the supervision and subject to the inspection of the Railroad and Warehouse Commission of the State of Minnesota, and shall, for the purposes of this act, be known and designated as public country elevators or country warehouses.

"It shall be unlawful to receive, ship, store or handle any grain in any such elevator or warehouse, unless the owner or owners thereof shall have procured a license therefor from the state Railroad and Warehouse Commission, which license shall be issued for the fee of one dollar per year, and only upon written application under oath, specifying the location of such elevator or warehouse and the name of the person, firm or corporation owning and operating such elevator or warehouse and the names of all the members of the firm or the names of all the officers of the corporation owning and operating such elevator or warehouse, and all moneys received for such licenses shall be turned over to the state grain inspection fund. Such license shall confer upon the licensee full authority to operate such warehouse or elevator in accordance with the laws of this State and the rules and regulations prescribed by said Commission, and every person, company or corporation receiving such license shall be held to have accepted the provisions of this act, and thereby to have agreed to comply with the same.

We here give only the first and second sections of the act:
" § 1. All elevators and warehouses in which grain is received,

---

" If any elevator or warehouse is operated in violation or in disregard of the laws of this State its license shall, upon due proof of this fact, after proper hearing and notice to the licensee, be revoked by the said Railroad and Warehouse Commission. Every such license shall expire on the thirty-first day of August of each year.

" § 2. No person, firm or corporation shall in any manner operate such public country elevator or country warehouse without having a license as specified in the preceding section, and any attempt to operate such elevator or warehouse without such license shall be deemed a misdemeanor to be punished as hereinafter provided, and any attempt to operate such elevator or warehouse in violation of law and without having the license herein prescribed, may upon complaint of the party aggrieved, and upon complaint of the Railroad and Warehouse Commission, be enjoined and restrained by the district court for the county in which the elevator or warehouse in question is situate, by temporary and permanent injunction, conformably to the procedure in civil actions in the district court. ·

" § 3. The Railroad and Warehouse Commission shall before the first of September of each year, and as much oftener as they shall deem proper, make and promulgate all suitable and necessary rules and regulations for the government and control of public country elevators and public country warehouses, and the receipt, storage, handling and shipment of grain therein and therefrom, and the rates of charges therefor, and the rates so fixed shall be deemed *prima facie* responsible and proper, and such rules and regulations shall be binding and have the force and effect of law; and a printed copy of such rules and regulations shall at all times be posted in a conspicuous place in each of said elevators and warehouses, for the free inspection of the public.

" § 4. The party operating such country elevator or country warehouse shall keep a true and correct account in writing, in proper books, of all grain received, stored and shipped at such elevator or warehouse, stating the weight, grade and dockage for dirt or other cause on each lot of grain received in store for sale, storage or shipment, and shall, upon the request of any person delivering grain for storage or shipment, receive the same without discrimination during reasonable and proper business hours, and shall, upon request, deliver to such person or his principal, a warehouse receipt or receipts therefor in favor of such person or his order, dated the day the grain was received, and specifying upon its face the gross and net weight of such grain, the dockage for dirt or other cause, and the grade of such grain, conformable to the grade fixed by the state Railroad and Warehouse Commission and in force at terminal points; and shall also state upon its face that the grain mentioned in such receipt or receipts has been received into store to be stored with grain of the same grade under such inspection, and that, upon the return of said receipt or receipts, and upon

stored, shipped or handled, and which are situated on the right
of way of any railroad, depot grounds or any lands acquired

the payment or tender of payment of all lawful charges for receiving, stor-
ing, delivering or otherwise handling said grain, which charges may have
accrued up to the time of the return of said receipt or receipts, such grain
is deliverable to the person named therein, or his order, either from the
elevator or warehouse where it was received for storage; or if the owner
so desires, in quantities not less than a carload on track on the same line
of railway at any terminal point in this State which the owner may desig-
nate, where state inspection and weighing is in force, such grain to be sub-
ject to such official inspection and weight as may be determined upon its
arrival or delivery at such terminal point and the party delivering shall be
liable for the delivery of the kind, grade and net quantity called for by such
certificate, less an allowance not to exceed sixty pounds per carload for
shrinkage or loss in transit, if such shrinkage or loss occurs. On the re-
turn or presentation of such receipts by the lawful holder thereof, prop-
erly endorsed, at the elevator or warehouse where the grain represented
therein is made deliverable and upon the payment or tender of payment of
all lawful charges, as hereinbefore provided, the grain shall be immediately
delivered to the holder of such receipt, and it shall not be subject to any
further charges for storage after demand for such delivery shall have been
made, and cars are furnished by the railway company which the party oper-
ating the elevator. or warehouse shall have called for promptly upon the
request for shipment made by the holder of such receipt in the order of
the date upon which such receipts are surrendered for shipment. The
grain represented by such receipt shall be delivered within twenty-four
hours after such demand shall have been made and cars or vessels or
other means of receiving the same from the elevator or warehouse shall
have been furnished.

" If not delivered upon such demand within twenty-four hours after such
car, vessel or other means for receiving the same shall have been furnished,
the warehouse in default shall be liable to the owner of such receipt for
damages for such default, in the sum of one cent per bushel, and in addi-
tion thereto one cent per bushel for each and every day of such neglect or
refusal to deliver; *provided*, no warehouseman shall be held to be in default
in delivering if the property is delivered in the order demanded by holders
of different receipts or terminal orders and as rapidly as due diligence, care
and prudence will justify.

" On the return of said receipts, if shipment or delivery of the grain at
terminal point is requested by the owner thereof, the party receiving such
grain shall deliver to said owner a certificate in evidence of his right to such
shipment or delivery, stating upon its face the date and place of its issue,
the name of the consignor and consignee and place of destination and shall
also specify upon the face of such certificate the kind of grain and the grade
and net quantity exclusive of dockage, to which said owner is entitled by

or reserved by any railroad company in this State to be used in connection with its line of railway at any station or siding.

his original warehouse receipts and by official inspection and weighing at such designated terminal point.

"The grain represented by such certificate shall be subject only to such freight or transportation or other lawful charges which would accrue upon said grain from the date of the issue of said certificate to the date of actual delivery, within the meaning of this act, at such terminal point.

"All warehouse receipts issued for grain received and all certificates shall be consecutively numbered, and no two receipts or certificates bearing the same number shall be issued during the same year from the same warehouse, except when the same is lost or destroyed, in which case the new receipt or certificate shall bear the same date and number as the original and shall be plainly marked on its face 'Duplicate.' Warehouse receipts or certificates shall not be issued except upon grain which has actually been delivered in said country warehouse. Warehouse receipts shall not be issued for a greater quantity of grain than was contained in the lot or parcel stated to have been received. No receipt or certificate shall contain language in anywise limiting or modifying the liability of the party issuing the same as imposed by the laws of this State, and any such language, if inserted, shall be null and void.

"A failure to specify in such warehouse receipts or certificates the true and correct grade and net weight, exclusive of dockage, of any lot of grain to which the owner of such grain may be entitled shall be deemed a misdemeanor on the part of the person issuing the same for which, on conviction, he may be punished as hereinafter provided.

"§ 5. In case there is a disagreement between the person in the immediate charge of and receiving the grain at such country elevator or warehouse, and the person delivering the grain to such elevator or warehouse for storage or shipment, at the time of such delivery, as to the proper grade or proper dockage for dirt or otherwise, on any lot of grain delivered, an average sample of at least three quarts of the grain in dispute may be taken by one or both parties and forwarded in a suitable sack, properly tied and sealed, express charges prepaid, to the chief inspector of grain at St. Paul, which shall be accompanied by the request in writing, of either or both of the parties aforesaid, that the said chief inspector shall examine the same and report what grade or dockage or both the said grain is, in his opinion, entitled to and would receive, if shipped to the terminal points and subjected to official inspection.

"It shall be the duty of said chief inspector, as soon as practicable, to examine and inspect such sample of grain and adjudge the proper grade or dockage or both, to which said sample is, in his judgment, entitled, and which grain of like quality and character would receive if shipped to the terminal points and subjected to official inspection.

"As soon as said chief inspector has examined, inspected and adjudged

in this State, other than at terminal points, are hereby declared to be public elevators, and shall be under the supervision and

---

the grade and dockage as aforesaid, he shall at once make out in writing and in triplicate a statement of his judgment and finding in respect to the case under consideration, and shall transmit by mail to each of the parties to said disagreement a copy of the said statement of his judgment and finding, preserving the original together with the sample on file in his office.

"The judgment and finding of the said chief inspector shall be deemed conclusive as to the grade or dockage, or both, of said sample, submitted for his consideration, as herein provided, as well as conclusive evidence of the grade or dockage, or both, that grain of the same quality and character would receive if shipped to the terminal points and subjected to official inspection.

"§ 6. Whenever complaint is made, in writing, to the Railroad and Warehouse Commission by any person aggrieved, that the party operating any country elevator or country warehouse under this act fails to give just and fair weights and grades, or is guilty of making unreasonable dockage for dirt or other cause, or fails in any manner to operate such elevator or warehouse fairly, justly and properly, or is guilty of any discrimination, then it shall be the duty of the Railroad and Warehouse Commission to inquire into and investigate said complaint and the charge therein contained, and to this end and for this purpose the Commission shall have full authority to inspect and examine all the books, records and papers pertaining to the business of such elevator or warehouse, and all the scales, machinery and fixtures and appliances used therein.

"In case the said Commission find the complaint and charge therein contained, or any part thereof, true, they shall adjudge the same in writing, and shall at once serve a copy of such decision, with a notice to desist and abstain from the error and malpractice found, upon the party offending and against whom the complaint was made, and to afford prompt redress to the party injured, and if such party does not desist and abstain and does not give the proper redress and relief to the party injured, it shall be the duty of the said Commission to make a special report of the facts found and ascertained upon the investigation of said complaint and the charge therein contained, which report shall also include a copy of the decision by said Commission made therein to the attorney of the county where such elevator or warehouse is located, who shall institute and carry on in the name of the complainant such actions, civil or otherwise, as may be necessary and appropriate to redress the wrongs complained of and to prevent their recurrence in the future.

"§ 7. Any person, firm or corporation operating any country warehouse or country elevator under this act shall, at any and all times when requested by the Railroad and Warehouse Commission, render and furnish in writing under oath to the said Commission a report and itemized statement of all grain received and stored in or delivered or shipped from such elevator or

subject to the inspection of the Railroad and Warehouse Commission of the State of Minnesota, and shall, for the purposes of this act, be known and designated as public country elevators or country warehouses. It shall be unlawful to receive, ship, store or handle any grain in any such elevator or warehouse,

---

warehouse during the year then last past. Such statement shall specify the kind, grade, gross and net weight of all grain received or stored, and all grain delivered or shipped, and shall particularly specify and account for all so-called overages that may have occurred during the year. Such statement and report shall be made upon blanks and forms furnished and prescribed by the Railroad and Warehouse Commission.

"The Commission shall cause every warehouse and the business thereof, and the mode of conducting the same, to be inspected at such times as the Commission may order, by one or more members of the Commission, or by some member of the grain inspection department, especially assigned for that purpose, who shall report in writing to the Commission the result of such examination; and the property, books, records, accounts, papers and proceedings, so far as they relate to their condition, operation or management, shall, at all times during business hours, be subject to the examination and inspection of such Commission.

"§ 8. It shall be unlawful for any person, firm or corporation who shall operate any country grain elevator or country warehouse, under this act, to enter into any contract, agreement, understanding or combination with any other person, firm or corporation, who shall operate any other country grain elevator or country grain warehouse under this act, for pooling of the earnings or business of other different and competing grain elevators or warehouses so as to divide between them the aggregate or net proceeds of the earnings or business of such grain elevators or warehouses, or any portion thereof; and in case of any agreement for the pooling of the earnings or business aforesaid, each day of its continuance shall be deemed a separate offense.

"§ 9. Any person, firm or corporation who is guilty of any of the misdemeanors specified in this act, or who is guilty of violating any of the provisions of this act, shall, on conviction, be punished by a fine of not less than fifty dollars and not more than five hundred dollars, and in case a natural person is so convicted, he may be imprisoned until the fine is paid or until discharged by due course of law; and in case a corporation is so convicted, the fine may be collected by execution, as judgments are collected in civil actions, or the property of the corporation may be sequestered and charged with the same in appropriate legal proceedings.

"§ 10. All laws and parts of laws inconsistent with this act are hereby repealed.

"§ 11. This act shall take effect and be in force from and after the date of its passage."

unless the owner or owners thereof shall have procured a license therefor from the state Railroad and Warehouse Commission, which license shall be issued for the fee of one dollar per year, and only upon written application under oath, specifying the location of such elevator or warehouse and the name of the person, firm or corporation owning and operating such elevator or warehouse and the names of all the members of the firm or the names of all the officers of the corporation owning and operating such elevator or warehouse, and all moneys received for such licenses shall be turned over to the state grain inspection fund. Such license shall confer upon the licensee full authority to operate such warehouse or elevator in accordance with the laws of this State and the rules and regulations prescribed by said Commission, and every person, company or corporation receiving such license shall be held to have accepted the provisions of this act, and thereby to have agreed to comply with the same. If any elevator or warehouse is operated in violation or in disregard of the laws of this State its license shall, upon due proof of this fact, after proper hearing and notice to the licensee, be revoked by the said Railroad and Warehouse Commission. Every such license shall expire on the thirty-first day of August of each year.

"§ 2. No person, firm or corporation shall in any manner operate such public country elevator or country warehouse without having a license as specified in the preceding section, and any attempt to operate such elevator or warehouse without such license shall be deemed a misdemeanor to be punished as hereinafter provided, and any attempt to operate such elevator or warehouse in violation of law and without having the license herein prescribed, may upon complaint of the party aggrieved, and upon complaint of the Railroad and Warehouse Commission, be enjoined and restrained by the district court for the county in which the elevator or warehouse in question is situate, by temporary and permanent injunction, conformably to the procedure in civil actions in the district court."

The complaint alleged that the elevator was used by the defendant company in connection with the railway for the receiving and shipping of wheat and other grains transported over

the lines of the railway company; was essential and necessary to the railway company in order promptly, safely and properly to handle grains received by it for shipment; and constituted, in that respect, a necessary adjunct of the railroad.

The facts upon which the case was determined are set forth in a finding based upon the stipulation of the parties and may be summarized as follows:

On April 16, 1895, and for more than a year prior thereto, the defendant company was engaged in the business of buying, selling and dealing in grain—its principal office and place of business being in the city of La Crosse, Wisconsin. It owned and operated large terminal and other grain elevators in that city, in Green Bay, and in other places in Wisconsin.

The village of Lanesboro contained about eleven hundred inhabitants, and was situated in the county of Fillmore, Minnesota, upon the railway line of the Southern Minnesota division of the Chicago, Milwaukee and St. Paul Railway Company, distant about fifty-four miles west from La Crosse, and having by the railway line referred to direct connection with that city.

Considerable quantities of grain had been annually raised in Fillmore County, and marketed, sold and delivered into local grain elevators and warehouses in Lanesboro and thence shipped in cars over the above-mentioned line of railway, which was the only means for such shipment.

The defendant company owned, occupied and operated a grain warehouse situated on the right of way of the railway company and along its tracks in Lanesboro.

No machinery or mechanical appliances whatever had been used or were contained in its warehouse at Lanesboro; and all grain of every kind received into it during the period in question had been hauled to the warehouse in bags or farm wagons and there unloaded. The bags of grain were placed upon small hand trucks at the entrance of the building and conveyed first to the weighing scale and thence to the grain bins of the warehouse into which the grain was poured from the bags.

The grain shipped from the warehouse was "spouted" by force of gravity into box cars standing on the railway tracks

and thence carried by the railroad company over its line for the defendant company to such points as the latter might direct.

Each parcel or lot of grain received into or deposited or handled in or shipped from the warehouse had been purchased by the defendant and was its sole and absolute property.

The defendant company during the period mentioned never received into or shipped from or handled or deposited or in any way stored in the warehouse any grain in which any other person or persons had any property, title, right or interest; nor issued or offered to issue any warehouse receipt or storage ticket for grain received there; nor carried on or offered or attempted to carry on in the warehouse the business of receiving, handling, storing or shipping grain of or for any other person or persons. But the warehouse was used, occupied and operated by the defendant solely for the purpose of receiving, handling and shipping its own grain in its private capacity as grain owner and merchant.

During all the time the warehouse was owned, occupied and operated by the defendant, all grain of every kind and description, received into or deposited or handled in or shipped from the warehouse, was purchased by it for the express purpose of acquiring, shipping and transporting it as its property solely to its terminal elevators in the cities of La Crosse and Green Bay, or to Milwaukee, Wisconsin, or to Chicago, Illinois, and thence to other points in States east of Lake Michigan and upon the Atlantic seaboard.

All the grain so received into or deposited or handled in the warehouse had been actually shipped as its property from the warehouse in carload lots over the railway line, and directly and continuously transported by the railway company beyond Minnesota to its terminal elevators, cities or points in Wisconsin, Illinois, and States other than Minnesota, and to no other points or places.

As fast as received into the warehouse from wagons all the grain was " spouted " into the box cars of the railway company for shipment, or was loaded into such cars severally containing different kinds of grades of grain separated from each other within the car by partitions, as sufficient grain for such a car-

load was accumulated in the warehouse, or was loaded out and so shipped as a full carload of grain of any one kind and grade was received into the warehouse; and no grain received or deposited in or shipped from the warehouse was handled or shipped in any manner other or different from one of the modes indicated, or kept in the warehouse longer or for any other purpose than as stated.

No grain received into or deposited or handled in or shipped from the warehouse had been bargained or sold or delivered to any person or firm or corporation doing business or resident in or a citizen of Minnesota, or shipped or transported to or delivered at any city, village, town, point or place within the boundaries of that State.

During the time mentioned all grain of every kind and description received into or deposited or handled in or shipped from the warehouse was grown in Minnesota, and was sold and delivered to the defendant by and received into the warehouse from citizens and residents of or other persons doing business in Minnesota, the weights, grades, dockage and inspection of all such grain having been fixed by mutual agreement between such persons and the company without controversy in respect thereto, and in no other manner and by no other persons; and no weighing, grading, docking or inspection of or supervision or regulation of any grain was performed or attempted or offered to be done or performed in or about the warehouse on the receipt or shipment of grain or at any other place or time by any person delegated or furnished by or acting under the authority of the State of Minnesota or of any law thereof or of the Railroad and Warehouse Commission of Minnesota, or any rule, regulation, officer, agent or representative thereof, or by any person in any capacity whatsoever.

The defendant company never applied to the Railroad and Warehouse Commission for license to receive, ship, store or handle any grain in its elevator, and never procured a license therefor from the Commission.

The parties stipulated and agreed that the plaintiff would make no claim of right to maintain the action except under and by virtue of the law in question.

Such being the case made by the finding of facts, the relief asked was denied, the court of original jurisdiction holding that the statute was not a lawful exercise of the police power and was repugnant as well to the constitution of Minnesota as to section one of the Fourteenth Amendment in so far as it declared warehouses and elevators in which only the grain of the owner was received, stored, shipped or handled to be public elevators, subject to the supervision of the Railroad and Warehouse Commission.

The case was carried to the Supreme Court of Minnesota, and the judgment was reversed. That court, speaking, by Judge Canty, said : " If the business carried on at this warehouse consisted of nothing more than storing defendant's own grain, we would concede that such business would warrant but little interference or regulation of it by the State. But that business does consist of something more. It was conceded on the argument, and is fairly to be inferred from the findings and stipulation of facts, that the grain is purchased, weighed, graded and delivered at the warehouse, and that defendant, with its own scales and appliances, weighs and grades the grain. Under these circumstances the warehouse is a sort of public market place, where the farmers come with their grain for the purpose of selling the same, and where the purchaser, a party in interest, acts as marketmaster, weighmaster, inspector and grader of the grain. Surely such a business is of a public character and is sufficiently affected with a public interest to warrant a very considerable amount of regulation of it by the State. The business carried on by defendant at its warehouse is similar to that carried on at a large number of other warehouses and elevators in this State. The grain crops of this State constitute by far the most important part of its commerce and its greatest resource. It is important to see that correct weights are had; that uniform grades are given; that the proper amount of dockage and no more is taken; that no dishonest practices are allowed and no undue advantage is permitted to be taken. Said chapter 148 requires the person operating such an elevator or warehouse to procure a license to be issued by the state Railroad and Warehouse Commission, for which a fee of one

dollar per year must be paid. The act also provides that such license may be revoked by the Commission if the warehouse or elevator is operated in violation or in disregard of the laws of this State. Section 2 provides that any person attempting to run such an elevator or warehouse without a license may be enjoined in a suit for that purpose. Section 3 provides that the Commission may make suitable and necessary rules and regulations for the government of public country warehouses and elevators. Then follow other provisions. There are undoubtedly many provisions in the act which apply only to warehouses and elevators in which grain is stored for others or for the public, and which provisions do not and cannot apply to such warehouses as the one here in question. There are, perhaps, provisions in the act which it would be unconstitutional to apply to such a warehouse as this. But such matters need not be considered at this time. The provision recognizing a license is not one of these. This disposes of the only question argued which it is necessary to consider." *State ex rel. &c.* v. *W. W. Cargill Co.*, 77 Minnesota, 223.

Judge Mitchell delivered a separate opinion, in which he said that in view of the fact, among others, that grain was the principal agricultural product of the State, that in its purchase and sale there was great liability to abuse in the matter of weights and grades, and that these were usually determined by the purchaser with his own instrumentalities, he agreed with the court that although the owner of a warehouse use it exclusively for the storage of his own grain, yet if he used it for the purpose of buying grain from the public, thus rendering it, in effect, a public market, his business was a proper subject of police regulation by the State to the extent of providing such rules and regulations as were reasonably necessary to secure to the public just and correct weights and grades. He was also of opinion that the requirement of a license might be a reasonable regulation in such cases as a means of enabling state officials to ascertain who were engaged in the business. But he was of opinion that the provisions of the statute constituted a system of rules and regulations the different parts of which were so connected with and dependent upon each other that it was in many in-

stances impossible to separate them; that many of them were wholly inapplicable to warehouses not used for the storage of grain for others. Some of them were, in his judgment, clearly not within the police power of the State as applied to warehouses not used for the storage of grain for others. Considering the case only upon the lines followed by the majority, Judge Mitchell was of opinion that in view of the connection and interdependence of its various provisions the whole act should be held invalid as to warehouses not used for the storage of grain for others.

We have seen that the only relief asked by the State was that the defendant company be restrained and enjoined from the further operation of its elevator in receiving, storing or handling of wheat or other grains until it was duly licensed therefor by the Railroad and Warehouse Commission. It was, in effect, adjudged that a license from that Commission was a condition precedent to the right of the defendant company to use or operate its elevator or warehouse in the manner and for the purposes indicated; also, that although the statute might contain many provisions not applicable to warehouses like the one owned by the defendant, and other provisions that, perhaps, were unconstitutional when applied to business like that in which the company was engaged, the provision requiring a license could stand and be enforced.

The questions just stated are questions of local law, and in determining whether the statute violates any right secured by the Federal Constitution we must, in the particulars named, accept the interpretation put upon it by the state court. In *Tullis* v. *Lake Erie & Western Railroad*, 175 U. S. 348, 353, the question was as to the constitutionality of a statute of Indiana relating to railroads and other corporations, except municipal corporations. The Supreme Court of that State held that the statute was capable of severance, and that its provisions as to railroads were not so connected in substance with the provisions relating to other corporations that their validity could not be separately determined. This court followed that view, declaring it to be an elementary rule that it should adopt "the interpretation of a statute of a State affixed to it by the court of last

resort thereof." See also *Missouri Pacific Railway Co.* v. *Nebraska,* 164 U. S. 403, 414; *Chicago, Milwaukee &c. Railway Co.* v. *Minnesota,* 134 U. S. 418, 456; *St. Louis, Iron Mountain &c. Railway* v. *Paul,* 173 U. S. 404, 408.

Pursuant to this rule, and without expressing any opinion on the question, we assume that the provision requiring a license from any person, firm or corporation proposing to engage in the business described in the first section embraces the defendant company; that such provision may stand alone; and that its validity may be determined without reference to other provisions of the statute.

Thus considering the statute, we are of opinion that the mere requirement of a license from a person, firm or corporation engaged in such business as that conducted by the defendant is not forbidden by the Fourteenth Amendment of the Constitution of the United States. "The liberty mentioned in that Amendment," we have said, "means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned." *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589. But to require the defendant company to obtain a license is not forbidden by the Amendment. The authority to make such a requirement is to be referred to the general power of the State to adopt such regulations as are appropriate to protect the people in the enjoyment of their relative rights and privileges, and to guard them against fraud and imposition. *Dent* v. *West Virginia,* 129 U. S. 114, 122; *Plumley* v. *Massachusetts,* 155 U. S. 461. The state court well said that the defendant's warehouse could be fairly regarded "as a sort of public market where the farmers come with their grain for the purpose of selling the same, and where the purchaser, a party in interest, acts as marketmaster, weighmaster, inspector and grader of the grain."

We cannot question the power of the State, so far as the Constitution of the United States is concerned, to require a license for the privilege of carrying on business of that character within its limits—such a license not being required for the purpose of forbidding a business lawful or harmless in itself, but only for purposes of regulation.

The defendant however insists that some of the provisions of the statute are in violation of the Constitution of the United States, and if it obtained the required license, it would be held to have accepted all of its provisions, and (in the same words of the statute) " thereby to have agreed to comply with the same." § 1. The answer to this suggestion is that the acceptance of a license, in whatever form, will not impose upon the licensee an obligation to respect or to comply with any provisions of the statute or with any regulations prescribed by the state Railroad and Warehouse Commission that are repugnant to the Constitution of the United States. A license will give the defendant full authority to carry on its business in accordance with the valid laws of the State and the valid rules and regulations prescribed by the Commission. If the Commission refused to grant a license, or if it sought to revoke one granted, because the applicant in the one case, or the licensee in the other, refused to comply with statutory provisions or with rules or regulations inconsistent with the Constitution of the United States, the rights of the applicant or the licensee could be protected and enforced by appropriate judicial proceedings.

But the further contention of the defendant company is that the requirement of a license from the owners of elevators and warehouses situated on the right of way of a railroad at one of its stations or sidings other than at terminal points, without requiring a license in respect of elevators and warehouses differently situated, is a denial of the equal protection of the laws, and makes the statute obnoxious to the principle that "no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition." *Bar-*

*bier* v. *Connolly*, 113 U. S. 27, 31; *Pembina Mining Co.* v. *Pennsylvania*, 125 U. S. 181.

Assuming that the defendant is entitled, upon this record, to invoke the benefit of the clause of the Fourteenth Amendment forbidding a State from denying to any person within its jurisdiction the equal protection of the laws, we adjudge that as the statute applies to all of the class defined in its first section, it is not invalid by reason of its non-application to those who own or operate elevators *not* situated on the right of way of a railroad. The railroad, as this court has often said, is a public highway established primarily for the convenience of the public, and—subject always to any right acquired by the railroad company under an inviolable contract with the State—the use of such a highway may be so regulated as to promote the public convenience, provided such a regulation be not arbitrary in its character and does not materially interfere with the enjoyment by the railroad company of its property. The right of way is so closely connected with the operations of the railroad company that its use may be so regulated by the State as to promote the ends for which the corporation was created, and thus subserve the interests of the general public without interfering unreasonably with the company's management of its property. If in the judgment of the State it was necessary for the public interests, or beneficial to the public, that elevators and warehouses of the kinds described should be operated only under a license and under such regulations as may be rightfully prescribed, it would be going very far to hold that such a classification was so unreasonable as to justify us in adjudging that the requirement of a license was void as denying the equal protection of the laws. No such judgment could be properly rendered unless the classification was merely arbitrary or was devoid of those elements that are inherent in the distinction implied in classification. We cannot perceive that the requirement of a license is not based upon some reasonable ground— some difference that bears a proper relation to the classification made by the statute. *Gulf, Col. & Santa Fé Ry.* v. *Ellis,* 165 U. S. 150, 165. It is worthy of observation in this connection that it was neither alleged nor proved that there were in the

State any elevators or warehouses that were not situated on the right of way of a railroad company.

It is also contended that the requirement of a license from the defendant company is inconsistent with the power of Congress to regulate commerce among the States. This view cannot be accepted. The statute puts no obstacle in the way of the purchase by the defendant company of grain in the State or the shipment out of the State of such grain as it purchased. The license has reference only to the business of the defendant at its elevator and warehouse. The statute only requires a license in respect of business conducted at an established warehouse in the State between the defendant and the sellers of grain. We do not perceive that in so doing the State has entrenched upon the domain of Federal authority, or regulated or sought to regulate interstate commerce. In no real or substantial sense is such commerce obstructed by the requirement of a license.

Without expressing any opinion as to the extent to which the Railroad and Warehouse Commission may supervise the business of a person, firm or corporation receiving a license under the statute, and restricting our decision to the only question necessary to be decided, we adjudge that the statute of Minnesota, so far as it requires a license for conducting such business as that in which the defendant is engaged, is not repugnant to the Constitution of the United States.

The judgment is

*Affirmed.*